**APPEAL NO. 24-13986-A**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

Markel Insurance Company,

*Plaintiff-Appellee*,

v.

Courtney Bowen, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Northern District of Georgia, Newnan Division, Case No. 3:23-cv-00088-TCB

---

**APPELLANTS' OPENING BRIEF**

---

Frank M. Lowrey IV
Matthew R. Sellers
Bondurant, Mixson &Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA 30309
Tel.: (404) 881-4100
*Attorneys for Appellants*

Dustin T. Brown
Crawford & Brown Law Firm LLP
P.O. Box 1118
Columbus, GA 31902
Tel.: 706-320-9646
*Attorney for Courtney Bowen, Justin Kibby, and K.J.K.*

Jefferson C. Callier
The Callier Firm
P.O. Box 2604
Columbus, GA 31902
Tel.: 706-323-7711

Michael D. Flint
Mary Ellen A. Lighthiser
McClure & Kornheiser, LLC
6400 Powers Ferry Rd., Ste. 150
Atlanta, GA 30339
Tel.: 678-338-2680

*Attorneys for Samantha Humphrey*

**No. 24-13986-A**
*Markel Insurance Company v. Courtney Bowen, et al.*

<u>**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**</u>

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, the following is an alphabetical list of the trial judges, attorneys, persons, firms, partnerships, and corporations that are known to have an actual or potential interest in the outcome of this appeal:

1. Batten, Timothy C. (U.S. District Judge)

2. Bertschi, Scott F.

3. Bondurant, Mixson & Elmore, LLP

4. Bowen, Courtney

5. Brown, Dustin T.

6. Callier, Jefferson C.

7. Carlton Fields, P.A.

8. Clyde & Co. US LLP

9. Crawford & Brown Law Firm LLP

10. Crawford, Jason L.

11. Flint Light, LLC

12. Flint, Michael D.

13. Friedman, Seth M.

C-1 of 2

14.    Humphrey, Samantha

15.    Kennedys CMK LLP

16.    Kibby, Justin

17.    K.J.K.

18.    Kull, Gary

19.    Lang, Jr., Joseph H.

20.    Lewis Brisbois Bisgaard & Smith LLP

21.    Lighthiser, Mary Ellen

22.    Lowrey IV, Frank M.

23.    Markel Insurance Company

24.    Markel Group, Inc.

25.    McClure & Kornheiser, LLC

26.    Retter, Eric

27.    Sellers, Matthew R.

28.    The Callier Firm

Markel Insurance Company's parent is Markel Group, Inc. ("MKL"), a publicly traded company. No individual or entity owns more than 10% of Markel Group, Inc. stock.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument. This case presents an undecided question about the meaning of two undefined terms in an insurance policy—"abuse" and "adjudicated to be a wrongdoer"—never addressed by Georgia courts or this Court. The district court erroneously construed those terms favorably to Appellee Markel Insurance Company ("Markel") and should be reversed. The proper construction of those terms will determine Markel's obligation to pay a $9.2 million judgment. Further, these so-called abuse exclusions are common in liability insurance policies. For the benefit of insurers and insureds, this Court should give a definitive interpretation of the form exclusion to guide future assessments of coverage. Oral argument will aid the Court in resolving that important question.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ..................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF AUTHORITIES ................................................................................ iv

JURISDICTIONAL STATEMENT ...................................................................... ix

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE................................................................................2

    I.    The Insurance Policy .................................................................3

    II.   The Underlying Incident .............................................................4

    III. Criminal Case Against Ms. Humphrey .........................................6

    IV. The Civil Case Against Ms. Humphrey ........................................7

    V.  The Declaratory Judgment Action ...............................................9

SUMMARY OF THE ARGUMENT .....................................................................11

ARGUMENT AND CITATIONS OF AUTHORITY ............................................13

I.    The district court erred in construing the Abuse Exclusion to exclude coverage for Ms. Humphrey's undisputedly unintentional conduct. .....................................13

   A.  Common dictionaries define "abuse" to refer only to intentional conduct...15

   B.  Georgia statutes define "abuse" to refer only to intentional conduct............19

   C.  The Policy's context supports construing abuse to mean intentional conduct..
      ..................................................................................................21

   D.  Other courts have held that "abuse" refers only to intentional conduct........25

II.   The district court erred in ruling that Humphrey's Georgia first-offender plea was an "adjudication of wrongdoing" that relieved Markel of its duty to defend. .29

    A.   A Georgia first-offender plea is not an adjudication of wrongdoing. ............30

    B.   A jury could conclude the judgment would have been smaller if Markel had defended Ms. Humphrey..............................................................................33

III.   The district court erred in granting summary judgment to Markel on Ms. Humphrey's claim for bad faith. ...........................................................................34

CONCLUSION...................................................................................................38

# TABLE OF AUTHORITIES

*Cases*                                                                                                                 *Page(s)*

*AEGIS Elec. & Gas Int'l Servs., Ltd. v. ECI Mgmt. LLC*,
    967 F.3d 1216 (11th Cir. 2020) ...............................................11, 13, 14, 30, 34

*Anderson v. Se. Fidelity Ins. Co.*,
    307 S.E.2d 499 (Ga. 1983) ................................................................22, 23

*Atlanta Cas. Ins. Co. v. Gardenhire*,
    545 S.E.2d 182 (Ga. Ct. App. 2001) .............................................................15

*Auto-Owners Ins. Co. v. Neisler*,
    779 S.E.2d 55 (Ga. Ct. App. 2015)...............................................................36

*Benton v. State*,
    877 S.E.2d 603 (Ga. 2022) ..........................................................................6

*Blue Ridge Auto Auction v. Acceptance Indem. Ins. Co.*,
    807 S.E.2d 51 (Ga. Ct. App. 2017)...............................................................29

*Boston Ins. Co. v. Gable*,
    352 F.2d 368 (5th Cir. 1965) .......................................................................25

*Brown v. Taylor*,
    No. 3:23-cv-175-TCB, 2024 WL 3360398 (N.D. Ga. June 4, 2024)............17

*Camacho v. Nationwide Mut. Ins. Co.*,
    188 F. Supp. 3d 1331 (N.D. Ga. 2016).........................................................34

*Century Surety Co. v. Club Adventure Learning Ctr. LLC*,
    674 F. Supp. 3d 362 (W.D. Tex. 2023) ..................................................17, 26

*Cincinnati Ins. Co. v. Hall*,
    Docket No. 308002, 2013 WL 3107640 (Mich. Ct. App. June 20, 2013) .............................................................................................27

*Cincinnati Ins. Co. v. Kastner*,
    504 S.E.2d 496 (Ga. Ct. App. 1998) .............................................................37

iv

*Claussen v. Aetna Cas. &. Sur. Co.*,
    380 S.E.2d 686 (Ga. 1989) ...................................................................13, 14, 17

*Colliers Int'l - Atlanta, LLC v. Maxum Indem. Co.*,
    640 F. Supp. 3d 1343 (N.D. Ga. 2022)........................................................29

*Colonial Oil Indus., Inc. v. Underwriters Subscribing to Policy Nos.
    TO31504670*,
    491 S.E.2d 337 (Ga. 1997) ...........................................................................38

*Culpepper v. Thompson*,
    562 S.E.2d 837 (Ga. Ct. App. 2002) ............................................................18

*Davis v. State*,
    537 S.E.2d 663 (Ga. 2000) .........................................................................6, 30

*Dorchester Mut. Ins. Co. v. Krusell*,
    150 N.E.3d 731 (Mass. 2020)........................................................................26

*Dunagan v. State*,
    502 S.E.2d 726 (Ga. 1998) ..............................................................................6

*Elonis v. United States*,
    575 U.S. 723 (2015)........................................................................................21

*Graham Cnty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*,
    559 U.S. 280 (2010)........................................................................................23

*Harrison v. McAffee*,
    778 S.E.2d 872 (Ga. Ct. App. 2016) ............................................................19

*Horus Vision, LLC v. Applied Ballistics, LLC*,
    Case No. 13-cv-5460, 2014 WL 6989233 (N.D. Cal. Dec. 9, 2014)............15

*In re S.C.S.*,
    784 S.E.2d 83 (Ga. Ct. App. 2016)...............................................................20

*Kain v. State*,
    650 S.E.2d 749 (Ga. Ct. App. 2007) ..............................................................6

*Khan v. Landmark Am. Ins. Co.*,
757 S.E.2d 151 (Ga. Ct. App. 2014) .......................................................12, 33

*Lee v. Smith*,
878 S.E.2d 594 (Ga. Ct. App. 2022) ............................................................33

*Lowery v. AmGuard Ins. Co.*,
629 F. Supp. 3d 1296 (N.D. Ga. 2022).........................................................35

*Matthews v. State*,
493 S.E.2d 136 (1997).................................................................12, 32, 33

*McAuliffe v. N. Ins. Co.*,
69 F.3d 277 (8th Cir. 1995) ..........................................................................22

*Nautilus Ins. Co. v. Our Camp Inc.*,
136 F. App'x 134 (10th Cir. 2005)...............................................................27

*Parker v. State*,
507 S.E.2d 744 (Ga. 1998) .............................................................................6

*Peachtree Cas. Ins. Co. v. Kim*,
512 S.E.2d 46 (Ga. Ct. App. 1999)...............................................................14

*Pitmon v. State*,
595 S.E.2d 360 (Ga. Ct. App. 2004) ............................................................32

*Robinson v. Liberty Mut. Ins. Co.*,
958 F.3d 1137 (11th Cir. 2020) ..............................................................16, 17

*Rutledge v. Auto-Owners Insurance Co.*,
548 S.E.2d 86 (Ga. Ct. App. 2001)..........................................................24, 25

*Schneider Nat'l Carriers, Inc. v. Utd. Spec'y Ins. Co.*,
603 F. Supp. 3d 1352 (M.D. Ga. 2022).........................................................38

*Smith v. State*,
797 S.E.2d 679 (Ga. Ct. App. 2017) ............................................................19

*State Farm Mut. Ins. Co. v. Drury*,
474 S.E.2d 64 (Ga. Ct. App. 1996)...............................................................35

vi

*St. Paul Mercury Ins. Co. v. FDIC*,
    774 F.3d 702 (11th Cir. 2014) ........................................................13, 17, 25, 28

*Transp. Ins. Co. v. Piedmont Constr. Grp., LLC*,
    686 S.E.2d 824 (Ga. Ct. App. 2009) ............................................................37

*Univ. N. Am. Ins. Co. v. Colosi*,
    322 F. Supp. 3d 1071 (D. Nev. 2018) ...........................................................27

*USAA v. Carroll*,
    486 S.E.2d 613, 616 (Ga. Ct. App. 1997) ....................................................37

*U.S. Fire Ins. Co. v. Mother Earth Sch.*,
    423 F. Supp. 3d 1048 (D. Ore. 2019) ...........................................................27

*Winding River Village Condo. Ass'n, Inc. v. Barrett*,
    459 S.E.2d 569 (Ga. Ct. App. 1992) ............................................................15

*York Ins. Co. v. Williams Seafood of Albany, Inc.*,
    223 F.3d 1253 (11th Cir. 2000) ......................................................11, 13, 21, 28

**Statutes**

8 U.S.C. § 1101(a)(48)(A) .............................................................................31

28 U.S.C. § 1291 ...........................................................................................ix

28 U.S.C. § 1332 ...........................................................................................ix

O.C.G.A. § 13-2-2(2) ................................................................................12, 31

O.C.G.A. § 15-11-2(2)(A) ..............................................................................20

O.C.G.A. § 15-11-2(2)(B)–(E) .......................................................................20

O.C.G.A. § 15-11-2(48) .................................................................................20

O.C.G.A. § 16-2-1 ...........................................................................................6

O.C.G.A. § 16-5-70(b)–(e) .............................................................................19

O.C.G.A. § 16-5-70(c) .................................................................................6, 18

O.C.G.A. § 17-7-95(c) ...............................................................32, 33

O.C.G.A. § 19-7-5(b)(5)(A)–(B) ......................................................21

O.C.G.A. § 19-7-5(b)(11) ................................................................21

O.C.G.A. § 19-15-1(3) .....................................................................21

O.C.G.A. § 30-5-3(1) .......................................................................20

O.C.G.A. § 30-5-4(a)(1)(A)(i) .........................................................20

O.C.G.A. § 33-4-6...............................................................9, 34, 35

O.C.G.A. § 42-8-60.............................................................................1

O.C.G.A. § 42-8-60(a) .....................................................................30

O.C.G.A. § 42-8-65(c)(1) ................................................................30

O.C.G.A. § 72-8-60(e) .......................................................................6

### Regulations

Nat'l Guidelines for Sex Offender Registration and Notification,
73 Fed. Reg. 38,030, 38,050 (July 2, 2008) ................................32

### Other Authorities

Black's Law Dictionary (12th ed. 2024) .........................................12, 31

U.S.S.G. § 4A1.2, comment n.10...................................................31

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction under 28 U.S.C. § 1332. The parties are completely diverse because the plaintiff, Markel Insurance Company, is an Illinois corporation with its principal place of business in Virginia, and the defendants are all individuals and citizens of Georgia. Doc. 1 ¶¶ 1–5. The case meets the amount-in-controversy requirement because Markel sought a declaration that it had no obligation to pay a $9.2 million judgment. *Id.* ¶ 6. This Court has appellate jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment in favor of Markel. Doc. 114.

## STATEMENT OF THE ISSUES

This case presents three issues:

1.      Whether, under Georgia law, the district court erred in construing the undefined term "abuse" in an insurance policy endorsement favorably to the insurer to exclude coverage when a reasonable definition of "abuse" found in dictionaries, statutes, and another endorsement in the policy itself would afford coverage.

2.      Whether, under Georgia law, the district court erred in holding that an insured's first-offender plea—which comes "*before* an adjudication of guilt" and without entry of judgment, O.C.G.A. § 42-8-60 (emphasis added)—meant the insured was "adjudicated to be a wrongdoer," such that the insurer could be excused from its duty to defend.

3.      Whether, under Georgia law, the district court erred in holding as a matter of law that Markel did not act in bad faith, despite Markel's notice of the ambiguity in its Policy and its failure to investigate the claim.

1

**STATEMENT OF THE CASE**

Appellee Markel Insurance Company refused to defend its insured, Appellant Samantha Humphrey, an employee of Child Development Schools, Inc. d/b/a Childcare Network, against a lawsuit alleging that her negligence injured K.J.K., an infant in her care. Without counsel, Ms. Humphrey had no idea how to defend herself. The Georgia state court hearing the case held a bench trial and found that "Ms. Humphrey negligently caused bodily injury to K.J.K." when his "leg was broken while Ms. Humphrey was changing his diaper." Doc. 1-1 at 2. But the court expressly found that "the injury was <u>not</u> expected or intended by Ms. Humphrey." Doc. 1-1 at 3. And it considered that finding consistent with Ms. Humphrey's earlier Georgia first-offender plea to cruelty to children in the second degree—an offense with the element of criminal negligence but not intent. Doc. 1-1 at 2. Markel nonetheless refused to indemnify the resulting $9.2 million judgment.

In making its coverage decision, Markel did not contact Ms. Humphrey, conduct its own investigation, or apprise Ms. Humphrey of any reason for denying her a defense. The Markel claims representatives who decided not to defend Ms. Humphrey did not testify or swear out an affidavit. The only contemporaneous documentation of the decision, the claim representative's notes, states that "the policy does not provide defense for formerly employed teacher Ms. Humphrey who was served in jail with the lawsuit." Doc. 83-27 at 56.

2

In this litigation, Markel relies solely on Ms. Humphrey's first-offender plea to support its denial of coverage. But the record shows Markel undertook no investigation of the factual basis for the plea, the elements of the offense, or the legal effect of a first-offender plea. Markel did not even have the plea in its claim file when it produced the file in this litigation. The plea was attached to Markel's Complaint, but there is no indication Markel's claim representatives considered it. This Part summarizes the case.

## I.    The Insurance Policy

Markel issued a general commercial liability policy and an umbrella policy (the "Policy") in favor of Childcare Network, a multi-state network of daycare centers, that (relevant here) covered damages arising from "bodily injury." Doc. 83-5 at 147; Doc. 83-4 at 10, 14. The umbrella policy follows the underlying insurance, meaning it provides coverage on the same terms as the commercial liability policy once the limits of the commercial liability policy are exhausted. Doc. 81-4 at 9. The policies afford a combined $11 million of coverage. Doc. 83-4 at 10; Doc. 83-8 at 2.

The Policy included an endorsement excluding coverage for bodily injury "arising out of the actual or threatened abuse, molestation or exploitation by anyone." Doc. 83-4 at 165. This brief calls the endorsement the Abuse Exclusion. That exclusion does not define "abuse," *see id.*, but, in another endorsement to the

Policy, Markel defined "abuse" to mean "an act which is committed with the intent to cause harm." Doc. 83-6 at 70; *see also* Doc. 81-4 at 7.

The Abuse Exclusion further obligated Markel to pay attorney's fees for Childcare Network employees accused of abuse "until such time as that 'employee' … is adjudicated to be a wrongdoer." Doc. 83-4 at 166. The exclusion does not define what it means to be "adjudicated to be a wrongdoer." *Id.*

## II.    The Underlying Incident

Ms. Humphrey was an employee of Childcare Network. Doc. 83-29 at 12. Childcare Network hired Ms. Humphrey as a cook at its LaGrange, Georgia location in February 2017, but it made her lead teacher in the infant room by May 2017 due to staffing shortages. Doc. 83-31 at 27–28; *see also* Doc. 83-30 at 1. In retrospect, Ms. Humphrey's manager at Childcare Network believed that she "may have put [Ms. Humphrey] in a position that she was not adequately trained to handle that could lead to frustration and failure to exercise reasonable care in caring for children." Doc. 83-30 at 1.

On August 15, 2017, Ms. Humphrey lifted one of the infants, K.J.K., onto a changing table and rotated his right leg to change his diaper. Doc. 83-29 at 9–10. She heard K.J.K.'s knee "pop" or a "snapping sound." Doc. 83-29 at 9. A surveillance camera captured the incident, and Appellants encourage the Court to review that footage for itself. *See* Doc. 117. The injury to K.J.K. is certainly tragic,

4

but the Court will see that there is no indication in the video that Ms. Humphrey intended to hurt K.J.K.[1] The video shows Ms. Humphrey holding K.J.K. to console him and then placing an icepack on his knee.

K.J.K.'s parents took him to the emergency room, where he was found to have a broken femur. Doc. 83-29 at 10. Childcare Network immediately suspended Ms. Humphrey. Doc. 83-29 at 10. Ms. Humphrey admitted to being "frustrated" at the time, because she was "stressed, overworked, and tired" from marital issues and having to get up at all hours with her own very young children. Doc. 83-29 at 9–10. But she testified she was not frustrated with K.J.K., Doc. 83-29 at 9, contrary to what the district court found in its order.[2] Doc. 113 at 2–3 n.1. She knew K.J.K.'s mother and "adored" her children. Doc. 83-29 at 11. She "didn't intend to hurt" K.J.K. Doc. 83-29 at 7.

Childcare Network then terminated Ms. Humphrey. Doc. 83-30 at 1. Childcare Network concluded Ms. Humphrey was "'caught mishandling a child' as

---

[1] The Court will also see that the video shows K.J.K. dragging his right leg behind him before Ms. Humphrey picked him up or changed his diaper. *See* Doc. 117 at time-stamp 1:10–1:35. Due to Markel's refusal to defend, Ms. Humphrey had no counsel to investigate the possibility that K.J.K. was injured before she changed his diaper.

[2] The district court based this conclusion on the Kibbys response to Markels' statement of material facts, Doc. 85 ¶ 4. However, the district court ignored that Markel did not dispute in response to the Kibbys statement of material facts that Ms. Humphrey was "frustrated" because she was "stressed, overworked, and tired," and "working on very little sleep" due to waking up with her own children. Doc. 93 ¶ 39.

a violation of policy." Doc. 83-30 at 1. But no one at Childcare Network believed Ms. Humphrey "intended to cause harm to" K.J.K. Doc. 83-30 at 1.

### III.    Criminal Case Against Ms. Humphrey

Law enforcement investigated the incident and charged Ms. Humphrey under Georgia law with cruelty to children in the second degree, O.C.G.A. § 16-5-70(c). Doc. 83-32. That investigation likewise concluded that Ms. Humphrey "did not intend to injure" K.J.K. Doc. 83-32. Cruelty to children in the second degree does not require intent to cause harm, but rather "criminal negligence," defined as "an act" of "willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." O.C.G.A. § 16-2-1. "[C]riminal intent and criminal negligence are not interchangeable." *Dunagan v. State*, 502 S.E.2d 726, 729 (Ga. 1998), *overruled on other grounds by Parker v. State*, 507 S.E.2d 744 (Ga. 1998). Criminal negligence requires "reckless conduct" "rather than an intentional act." *Kain v. State*, 650 S.E.2d 749, 752 (Ga. Ct. App. 2007).

Ms. Humphrey took a first-offender plea to the charge. A first-offender plea "does not constitute a 'conviction,'" but instead "suspend[s]" the criminal case until the defendant satisfies any conditions of the plea. *Davis v. State*, 537 S.E.2d 663, 664 (Ga. 2000). Once the conditions are met, the defendant "'shall be exonerated of guilt and shall stand discharged as a matter of law.'" *Benton v. State*, 877 S.E.2d 603, 607 (Ga. 2022) (quoting O.C.G.A. § 72-8-60(e)).

At the plea colloquy, the prosecutor confirmed that he did not "believe [Ms. Humphrey] was malicious." Doc. 81-3 at 20. The state criminal court agreed that the decision not to charge Ms. Humphrey with intentional conduct was "probably right." Doc. 81-3 at 23. The court accepted the first-offender plea and imposed a four-year sentence. Doc. 81-3 at 14, 24. Ms. Humphrey served 18 months before being paroled for good behavior. Doc. 83-29 at 12. She has never violated any terms of the plea.

## IV.    The Civil Case Against Ms. Humphrey

K.J.K.'s parents, Courtney Bowen and Justin Kibby (together, the "Kibbys"), brought a civil action against Childcare Network and Ms. Humphrey in Georgia state court, asserting negligence, negligence per se, and negligent infliction of emotional distress. Doc. 83-14 at 24–28. Childcare Network tendered the defense to Markel, which provided counsel. *See* Doc. 86-2 at 3.

Markel internally decided not to defend Ms. Humphrey, with its claims file stating merely that "she was served in jail with the lawsuit." Doc. 83-27 at 56. In this litigation, Markel argues its denial was proper because she "abused" K.J.K., a conclusion based solely on the first-offender plea. Doc. 81-4 at 4. Markel never made any effort to determine the elements of Ms. Humphrey's offense and never investigated the factual basis for the plea. Doc. 81-4 at 6. It never spoke with Ms. Humphrey. Doc. 81-4 at 6. There is no evidence Markel reviewed the video of the incident or researched the definition of abuse at the time of the denial. Doc. 81-4 at

7

6, 8. And Markel never informed Ms. Humphrey that it determined it had no duty to provide a defense or coverage. Doc. 81-4 at 5. Ms. Humphrey sent Markel a written request for a defense in December 2022. Doc. 8-1. Markel did not respond.

The case proceeded to a bench trial in May 2023. The Kibbys dismissed Childcare Network before trial, but Childcare Network's lawyer—paid for by Markel—stayed for the trial but did nothing as proceedings against its insured unfolded and the court entered a $9.2 million judgment. Doc. 86-2 at 15.

The case might well have turned out differently if Ms. Humphrey had counsel. Ms. Humphrey presented no evidence and did not examine the Kibbys' witnesses. Doc. 83-29 at 14. Nor did she object to the Kibbys presentation of undisclosed expert testimony, Doc. 83-29 at 7, on which the court relied to award $2 million in special damages, *see* Doc. 1-1 at 3. Markel's counsel testified she would have objected to the undisclosed testimony. Doc. 86-2 at 15–16. But "without a lawyer there to help," Ms. Humphrey "had no idea what to do." Doc. 83-29 at 14.

The court entered judgment of $9.2 million for the Kibbys. Doc. 1-1 at 3. Like everyone else who reviewed the case, the court found that Ms. Humphrey did not intend to harm K.J.K. Doc. 1-1 at 2. To the contrary, it found that Ms. Humphrey's "negligence" caused K.J.K.'s injuries. *See id.* Ms. Humphrey retained counsel and presented a claim for payment of the judgment to Markel. Doc. 8-2 at 1–3.

8

## V.    The Declaratory Judgment Action

Markel responded to the request to indemnify the judgment by suing Ms. Humphrey and the Kibbys in federal district court. *See* Doc. 1. Markel sought a declaration that it had no duty to defend or indemnify Ms. Humphrey under the general commercial liability or umbrella policies, and it also sought a declaration that it had not acted in bad faith. Doc. 1 ¶¶ 33–57.

Ms. Humphrey and the Kibbys both counterclaimed that Markel breached its duty to defend Ms. Humphrey and indemnify the judgment. Doc. 8 ¶¶ 48–82; Doc. 9 ¶¶ 46–78. Ms. Humphrey also counterclaimed that Markel's breach was in bad faith, subjecting it to liability under Georgia law for an additional 50% of the loss covered by the policy and attorney's fees under O.C.G.A. § 33-4-6. Doc. 10 ¶¶ 83–90.

On cross-motions for summary judgment, Docs. 81-1, 83-1, the district court granted summary judgment to Markel. Doc. 113. Despite acknowledging sources defining abuse as conduct intended to cause harm, the district court relied on what it called "Markel's multiple, more broadly used dictionaries" to hold that the Abuse Exclusion applies to negligence. Doc. 113 at 24. It further held that Markel had not breached its duty to defend Ms. Humphrey because it concluded that her first-offender plea was an "adjudication of wrongdoing" as the Abuse Exclusion used that phrase. Doc. 113 at 33–37. And it finally held that Markel was entitled to summary

judgment on bad faith because Markel had not breached its duties to defend or to indemnify. Doc. 113 at 37–40.

The Kibbys and Ms. Humphrey timely appealed. Doc. 118.

## SUMMARY OF THE ARGUMENT

On *de novo* review, this Court should reverse the district court's summary judgment for Markel. *See AEGIS Elec. & Gas Int'l Servs., Ltd. v. ECI Mgmt. LLC*, 967 F.3d 1216, 1223 (11th Cir. 2020). The district court erred in three respects.

First, the district court erred in granting summary judgment to Markel based on the Abuse Exclusion. The district court construed the Abuse Exclusion broadly to exclude coverage for intentional *and* negligent conduct, despite dictionary definitions, Georgia statutes, and a definition in an endorsement to the Policy that point to a narrower definition of "abuse" as conduct intended to cause harm. Georgia law requires narrow, not broad, construction of insurance exclusions. *See York Ins. Co. v. Williams Seafood of Albany, Inc.*, 223 F.3d 1253, 1255 (11th Cir. 2000).

The district court turned this fundamental principle of insurance law upside down, even as it acknowledged that "the outer limits of 'abuse'" are unclear and declined to give a precise definition of the term. Doc. 113 at 19. Since Markel left the term "abuse" undefined in the Abuse Exclusion, it is not entitled to retroactively adopt a definition *less* favorable to its insureds than the definition it *did* write in another endorsement. Properly construed, the Abuse Exclusion does not apply to Ms. Humphrey's undisputedly unintentional conduct. The judgment is covered by the Policy, and Markel is liable for the judgment in full as a matter of law.

11

Second, the district erred in holding that Ms. Humphrey's first-offender plea "adjudicated" her "to be a wrongdoer" and thus excused Markel from its duty to defend. "Adjudication" is a legal term with a specific meaning: the resolution of a legal dispute by entry of judgment. *See* Adjudication, Black's Law Dictionary (12th ed. 2024). Georgia law required the district court to give the term that legal meaning. *See* O.C.G.A. § 13-2-2(2). Because a first-offender plea is *not* an adjudication under Georgia law, *see Matthews v. State*, 493 S.E.2d 136 (Ga. 1997), Markel should have defended Ms. Humphrey. There is evidence that the judgment would have been smaller had it done so. Because Markel "fail[ed] to offer a defense, it may be liable to its insured beyond the policy limits to the full amount of the judgment" because its "breach … caused the insured to be exposed to greatly increased liability." *Khan v. Landmark Am. Ins. Co.*, 757 S.E.2d 151, 156 (Ga. Ct. App. 2014).

Third, the district court erred in granting summary judgment on Markel's bad faith. The district court rejected the bad faith claim because it concluded Markel had not breached its duties to defend or indemnify. That was error, and so it was likewise error to reject the bad faith claim. There is evidence from which a jury could find that Markel acted in bad faith. It made no effort to investigate Ms. Humphrey's plea, the elements of the crime, or the effect of a first-offender plea. Nor did it acknowledge the ambiguities in its Policy. And it declined to defend its insured. All three failures provide grounds to find bad faith under binding Georgia precedent.

12

## ARGUMENT AND CITATIONS OF AUTHORITY

**I.     The district court erred in construing the Abuse Exclusion to exclude coverage for Ms. Humphrey's undisputedly unintentional conduct.**

The district court committed reversible error by construing the Abuse Exclusion in favor of Markel, the insurer, rather than in favor of coverage of Ms. Humphrey. Despite acknowledging that the word "abuse" could refer only to *intentional* conduct, the district court relied on what it called "Markel's multiple, more broadly used dictionaries" to hold that abuse "includes negligent conduct," and thus that the Abuse Exclusion excludes coverage. Doc. 113 at 24. That construction runs counter to "Georgia's substantive law," which "governs [the] interpretation of the Policy" in this diversity action." *AEGIS Elec.*, 967 F.3d at 1223.

Under Georgia law, "exclusions to insuring agreements" like the Abuse Exclusion "require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." *York Ins. Co.*, 223 F.3d at 1255. "Thus, if an insurance contract is capable of being construed in two ways," Georgia law requires that the policy "be construed against the insurance company and in favor of the insured." *Claussen v. Aetna Cas. &. Sur. Co.*, 380 S.E.2d 686, 687 (Ga. 1989). "There is a low threshold for establishing ambiguity in an insurance policy." *St. Paul Mercury Ins. Co. v. FDIC*, 774 F.3d 702, 709 (11th Cir. 2014). "As recognized by Georgia courts, if a provision of an insurance contract is susceptible

13

of two or more constructions, even when the multiple constructions are all logical and reasonable, it is ambiguous." *Id.* (quotation omitted).

As explained below, four sources Georgia courts rely on to interpret insurance contract terms—common dictionary definitions, Georgia statutes, the context of the Policy, and authority from other jurisdictions—establish that the Abuse Exclusion is, at a minimum, susceptible of two constructions. On one construction, "abuse" refers only to intentional conduct, and the district court should have given the Policy that construction because it affords coverage. That "abuse" might sometimes refer to neglectful conduct in other contexts could only establish, at most, that the term is ambiguous—which still would not authorize any court to interpret the Policy to exclude coverage. *See Claussen*, 380 S.E.2d at 687.

Here, Markel agreed to cover "bodily injury" broadly, and so it had a duty to define "any exclusions" from that coverage "clearly and distinctly." *Peachtree Cas. Ins. Co. v. Kim*, 512 S.E.2d 46, 47–48 (Ga. Ct. App. 1999). Markel thus should have specified a broader definition of "abuse" if that is what it wanted. Because it failed to specify the broader definition, the law required the district court to select the construction that affords coverage. On *de novo* review, *see AEGIS Elec.*, 967 F.3d at 1223, this Court should reverse the district court's failure to do so

A word about Ms. Humphrey's culpability before turning to interpretation of the Policy. This Court must review the Policy in light of the undisputed fact that Ms.

14

Humphrey acted negligently, not intentionally. Markel cannot argue otherwise because, having failed to "follow[] the procedurally safe course of providing a defense under a reservation of rights," it "is bound by the prior judgment" against Ms. Humphrey. *Atlanta Cas. Ins. Co. v. Gardenhire*, 545 S.E.2d 182, 184 (Ga. Ct. App. 2001) (quotation omitted). *Gardenhire* binds Markel to the state court finding in the civil action that Ms. Humphrey's *negligence* caused injury. Doc. 1-1 at 2–3.

The district court refused to estop Markel because it believed that "whether [Ms. Humphrey] acted intentionally or negligently was not essential to the judgment." Doc. 113 at 33. That makes no sense. The state court judgment "necessarily decided that [Ms. Humphrey] w[as] negligent and that [her] negligence was a proximate cause of [K.J.K.'s] injuries." *Winding River Village Condo. Ass'n, Inc. v. Barrett*, 459 S.E.2d 569, 572 (Ga. Ct. App. 1992). That essential finding binds Markel and should control interpretation of the Policy.

### A. Common dictionaries define "abuse" to refer only to intentional conduct.

The district court erroneously relied on dictionary definitions of "abuse" favorable to Markel rather than definitions favorable to coverage. It should have done the opposite. Several common dictionaries, some of which the district court cited, confirm that "abuse" can refer only to intentional conduct. It follows that the Abuse Exclusion does not apply to Ms. Humphrey's unintentional conduct.

15

Two dictionaries make the point. Collins English Dictionary—on which this Court has relied to construe an insurance policy, *see Robinson v. Liberty Mut. Ins. Co.*, 958 F.3d 1137, 1141 (11th Cir. 2020)—defines "abuse" as "cruel and violent treatment,"[3] and "cruel" as "*deliberately* seeking to inflict pain and suffering."[4] Wex, Cornell Law School's Legal Dictionary, defines abuse as "an action that *intentionally* causes harm or injures another person."[5] These definitions, which Markel itself accepted as reasonable definitions of the term, Doc. 81-4 at 10, should have led the district court to rule in favor of coverage.

The district court misconstrued another dictionary on which it relied. Merriam-Webster's Dictionary defines the noun form of "abuse" as "physical maltreatment,"[6] and defines "maltreat" by referring to the verb form of "abuse,"[7] which in turn is defined to mean "to use or treat *so as to* injure or damage."[8] That definition requires intent because "the phrase 'so as' specifies … *the intention* with

---

[3] Abuse, Collins English Dictionary, available at:
https://www.collinsdictionary.com/us/dictionary/english/abuse
[4] Cruel, Collins English Dictionary, available at:
https://www.collinsdictionary.com/us/dictionary/english/cruel (emphasis added).
[5] Abuse, Wex, Cornell Law School Legal Information Institute, available at:
https://www.law.cornell.edu/wex/abuse (emphasis added).
[6] Abuse, Merriam-Webster's Dictionary, available at: https://www.merriam-webster.com/dictionary/abuse.
[7] Maltreat, Merriam-Webster's Dictionary, available at: https://www.merriam-webster.com/dictionary/maltreatment (emphasis added).
[8] Abuse, Merriam-Webster's Dictionary, available at: https://www.merriam-webster.com/dictionary/abuse.

which an action is performed." *Horus Vision, LLC v. Applied Ballistics, LLC*, No. 13-cv-5460, 2014 WL 6989233, at \*14 (N.D. Cal. Dec. 9, 2014) (emphasis added); *see also Century Surety Co. v. Club Adventure Learning Ctr. LLC*, 674 F. Supp. 3d 362, 371–72 (W.D. Tex. 2023) (defining "so as to" to mean "for the purpose of").

The Policy covers Ms. Humphrey's unintentional conduct under any of these accepted definitions of "abuse." The district court's contrary analysis has three flaws.

First, the district court turned the legal standard upside down when it relied on what it called "Markel's multiple, more broadly used dictionaries." Doc. 113 at 24. The law does not weigh which side, insurer or insured, came up with more or "more broadly used" dictionaries. Instead, Georgia law requires the construction that favors the insured, even if the insurer's proposed definition is also "logical and reasonable." *St. Paul Mercury Ins.*, 774 F.3d at 709 (quotation omitted); *see also Claussen*, 380 S.E.2d at 687. Besides, the dictionaries that favor coverage here *are* broadly used. This Court has cited Collins English Dictionary, *see Robinson*, 958 F.3d at 1141, and the district court relied on Wex in another case, *see Brown v. Taylor*, No. 3:23-cv-175-TCB, 2024 WL 3360398, at \*4 n.5 (N.D. Ga. June 4, 2024) (citing Wex to define "fee tail").

Second, in a move that effectively rewrote the Abuse Exclusion in favor of Markel, the district court selectively relied on dictionary definitions of the phrase

17

"child abuse" to interpret the Abuse Exclusion. Doc. 113 at 20–21. The district court held that "abuse" must include negligence because some dictionaries define "child abuse" to include "neglect." Doc. 113 at 20. That is not universally true; Merriam-Webster's Dictionary defines child abuse by referring to the verb form of abuse, which, as discussed, has an intent to injure in the definition. *See supra* at 21–22.

But regardless, the district court improperly conflated negligence and neglect. The ordinary meaning of neglect, as the district court observed, runs the gamut from "inadvertent" to "negligent" to "willful" conduct. Doc. 113 at 24. Negligence does not have that same breadth. "Wilful and wanton conduct does not encompass negligence … . Wilful conduct is based on an actual intention to do harm or inflict injury." *Culpepper v. Thompson*, 562 S.E.2d 837, 840 (Ga. Ct. App. 2002). Markel is bound by the judgment that Ms. Humphrey acted negligently and unintentionally.

Third, the district court erroneously concluded that Ms. Humphrey's conduct was "cruel" because the criminal statute to which she pled is captioned cruelty to children. Doc. 113 at 25. Yet the district court discounted that the indictment charged Ms. Humphrey with causing "excessive" pain, not with being "cruel," Doc. 1-4 at 5, even though the statute makes it a crime to cause a child "cruel *or* excessive" pain, O.C.G.A. § 16-5-70(c) (emphasis added). The indictment language matters; "averments in an indictment as to the specific manner in which a crime was

18

committed are not mere surplusage, and such averments must be proved as laid." *Smith v. State*, 797 S.E.2d 679, 685 (Ga. Ct. App. 2017).

The district court also disregarded that the criminal statute sweeps more broadly than the ordinary definition of cruelty as "deliberately seeking to inflict pain." *See supra* at 22 n. 4. Georgia cruelty to children comes in three degrees: the first-degree tracks the ordinary meaning of cruelty and requires "maliciously" causing pain; the second-degree requires "criminal negligence;" and the third-degree makes it a misdemeanor to intentionally or knowingly allow a child to witness a forcible felony or battery. O.C.G.A. § 16-5-70(b)–(e). The district court moreover did not acknowledge that Georgia courts must "explicitly f[i]nd the statute in question to be ambiguous before considering the caption of the act." *Harrison v. McAffee*, 788 S.E.2d 872, 877 (Ga. Ct. App. 2016) (en banc). If there were ambiguity to the word "cruelty," the district court should have favored coverage. Against all this, the district court's reliance on the caption was erroneous.

### B. Georgia statutes define "abuse" to refer only to intentional conduct.

The district court similarly erred in relying on broad rather than narrow statutory definitions of "abuse" that favored Markel. Like common dictionaries, the Georgia Code in places uses the word "abuse" to refer only to intentional conduct.

Most significantly, the Georgia Juvenile Code defines "abuse" as "[a]ny *nonaccidental* physical injury or physical injury which is inconsistent with the

19

explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child."[9] O.C.G.A. § 15-11-2(2)(A) (emphasis added). The statute does not define "nonaccidental," but Georgia courts define it as deliberate, intentional conduct. *See In re S.C.S.*, 784 S.E.2d 83, 92 (Ga. Ct. App. 2016) (affirming finding of abuse when "injuries were *deliberately* inflicted and not accidental" (emphasis added)). Notably, the Juvenile Code defines "neglect" separately from "abuse." O.C.G.A. § 15-11-2(48).

Other Georgia code sections also define abuse as intentional. The Georgia statutes that protect disabled adults and elder persons define abuse as "the *willful* infliction of physical pain, physical injury, sexual abuse, [or] mental anguish." O.C.G.A. § 30-5-3(1) (emphasis added). Using that definition, Georgia law requires certain professionals to make a mandatory report if they "believe that a disabled adult or elder person has been the victim of abuse, *other than by accidental means*." O.C.G.A. § 30-5-4(a)(1)(A)(i) (emphasis added).

Rather than look to these statutes, the district court relied on the Georgia Domestic Relations Code, which defines "child abuse" more broadly to include both

---

[9] That same code section also defines abuse to encompass other forms of conduct that, although not at issue here, similarly require intent: (1) "emotional abuse," (2) "sexual abuse or sexual exploitation," (3) "prenatal abuse" (defined as abuse of drugs or alcohol during pregnancy), or (4) the "commission of an act of family violence" (defined as a felony between members of the same household) "in the presence of a child." O.C.G.A. § 15-11-2(2)(B)–(E).

"[p]hysical injury or death inflicted upon a child … by other than accidental means" or "[n]eglect of a child." O.C.G.A. § 19-7-5(b)(5)(A)–(B); *see also* O.C.G.A. § 19-15-1(3) (giving a similar definition). "Neglect," as defined in these statutes, does not require intentional conduct. *See* O.C.G.A. § 19-7-5(b)(11).

The district court's competing statutory definition does not render the Policy unambiguous. That "abuse" *can* be defined more broadly than intentional conduct does not change this Court's obligation to give the Abuse Exclusion a "narrow construction." *York Ins. Co.*, 223 F.3d at 1255. The district court's reliance on broader definitions is a repeat of its error in looking to broad rather than narrow dictionary definitions of "abuse."

### C. The Policy's context supports construing abuse to mean intentional conduct.

Three other interpretive clues from the Policy—the context of the Abuse Exclusion, the canons of construction, and another Policy provision—all likewise demonstrate that the Abuse Exclusion requires intentional conduct.

Start with the context of the Abuse Exclusion, which applies to "actual or *threatened* abuse." Doc. 83-4 at 165 (emphasis added). The modifier "threatened" necessarily requires intent. The United States Supreme Court has recognized that "[e]very definition of 'threat' or 'threaten' conveys the notion of an *intent* to inflict harm." *Elonis v. United States*, 575 U.S. 723, 732–33 (2015) (emphasis added). That modifier makes no sense if "abuse" includes negligence, which is, of course,

21

unintentional conduct. A person cannot intentionally threaten to inflict accidental harm. *Id.* The district court simply ignored the Kibbys' argument about this context. *See* Doc. 113 at 28–29; *see also* Doc. 107 at 9.

Turning to the canons, the *noscitur a sociis* rule, which directs that a word "must be gauged by the words surrounding it," points to the same conclusion. *Anderson v. Se. Fidelity Ins. Co.*, 307 S.E.2d 499, 500 (Ga. 1983). The Abuse Exclusion contains a list of conduct: "abuse, molestation, or exploitation." Doc. 83-4 at 165. Molestation and exploitation are intentional acts.[10] What's more, both words connote sexual violence. For example, the Eighth Circuit applied an abuse exclusion to a priest who "cultivated a sexual relationship with a married female parishioner" because it concluded "the parishioner was sexually exploited while [the priest] performed the counseling functions the church had expected him to perform." *McAuliffe v. N. Ins. Co.*, 69 F.3d 277, 278–79 (8th Cir. 1995). Abuse can carry that same meaning. The Oxford English Dictionary, for example, defines "abuse" as "[s]exual violation, *esp.* rape; sexual assault or maltreatment (esp. of a woman or child)," and "[i]n later use frequently including also physical or emotional ill-

---

[10] Molestation, Collins English Dictionary (molestation means "the act of accosting or attacking, esp. with the *intention* of committing a sexual assault") available at: https://www.collinsdictionary.com/us/dictionary/english/molestation; Exploit, Collins English Dictionary (exploit means "to make unethical use of for one's own advantage or profit; specif. to make profit from the labor of others without giving a just return"), available at: https://www.collinsdictionary.com/us/dictionary/english/exploit

treatment."[11] This Court should construe the word "abuse" as intentional in line with these surrounding words.

The district court rejected the *noscitur a sociis* canon based on a U.S. Supreme Court case holding that a list of three "is too short to be particularly illuminating." Doc. 113 at 30 (quoting *Graham Cnty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288 (2010)). But it should have looked to governing Georgia precedent, applying the canon to a list of three in an insurance policy. *See Anderson*, 307 S.E.2d at 500.

In *Anderson*, the Georgia Supreme Court confronted a term in a car insurance policy excluding coverage if the car was (1) "rented or leased to others," (2) "used as a public livery conveyance," or (3) "used or operated in any racing event, speed contest, or exhibition." *Id.* at 499–500. The court held that the exclusion for "racing events" did not apply to an "impromptu" drag race because the first two exclusions implied "*some* degree of structured deliberateness on the part of the insured." *Id.* at 500. So too here, the exclusions for molestation and exploitation imply a requirement of intentional conduct.

Finally, the district court erred by failing to construe the Abuse Exclusion in light of the Policy's Texas Professional Liability Coverage Endorsement, which

---

[11] Abuse, Oxford English Dictionary (rev. 2011), available at: https://www.oed.com/dictionary/abuse_n?tab=meaning_and_use#2273779.

defines "abuse"" as "an act which is committed with the intent to cause harm." Doc. 83-6 at 70. That endorsement contains an abuse exclusion that excludes coverage for professional liability arising from "actual, threatened, or alleged … 'abuse' of any type." Doc. 83-6 at 66. The Texas Professional Liability Endorsement definition confirms what dictionaries and Georgia statutes already make clear: that abuse can reasonably be defined as only referring to acts committed with the intent to cause harm. Even Markel's corporate designee agreed that "[i]f there is a defined term in a policy, then, yes, that term should be applied as defined." Doc. 81-4 at 9.

The district court rejected the definition from the Texas Professional Liability Endorsement on the theory that the endorsement does not apply in this case. Doc. 113 at 17. But again, Georgia precedent holds that an endorsement definition, even in an endorsement not applicable to the case, informs the interpretation of the Policy.

In *Rutledge v. Auto-Owners Insurance Co.*, 548 S.E.2d 86 (Ga. Ct. App. 2001), the Georgia Court of Appeals confronted whether a car insurance policy that covered "relatives" of the insured using a car covered the sister of the insured's deceased wife. *Id.* at 88. The liability coverage section of the policy did not define relative, but the uninsured motorist endorsement defined relative as a person "related to you by blood, marriage or adoption." *Id.* Relying in part on that definition, the court held that the policy covered the insured's deceased wife's sister as a "relative" of the insured. *Id.*

24

The district court rejected *Rutledge* because the Texas Professional Liability Endorsement states that it does not modify other Policy terms. Doc. 9-3 at 75. The district court seemed to think that *Rutledge* applies only when endorsements are "generally applicable to the entire policy." Doc. 113 at 16. That is a misreading. *Rutledge* found the uninsured motorist endorsement "instructive for purposes of analysis" precisely because "the term 'relative' [was] not defined" in "the liability section." 548 S.E.2d at 88 (emphasis added). That same logic applies here.

Thus, the Abuse Exclusion's context, the *noscitur a sociis* canon, and other Policy provisions all support a construction that affords coverage.

### D. Other courts have held that "abuse" refers only to intentional conduct.

If dictionaries, Georgia statutes, and the Policy itself were not enough, courts around the country have interpreted abuse exclusions to apply only to intentional conduct. Those cases support reversal because, "[i]n Georgia, if the courts cannot with any degree of assurance, or unanimity, interpret exclusion provisions of this kind, that fact alone weighs heavily against the insurer because the fine print of the policy, where ambiguous, is construed in favor of the assured." *St. Paul Mercury Ins.*, 774 F.3d at 710 (quotation omitted and alteration adopted) (applying Georgia law); *see also Boston Ins. Co. v. Gable*, 352 F.2d 368, 370 (5th Cir. 1965) ("[S]ince the interpretation of this contractual language has been differently construed by

25

courts of different jurisdictions, thus making the construction doubtful," the exclusion should be construed against the insurer).

In *Century Surety Co. v. Club Adventure Learning Center LLC*, 674 F. Supp. 3d 362 (W.D. Tex. 2023), the Western District of Texas considered precisely the same question presented here: "whether 'abuse' encompasses negligence" as used in an abuse exclusion. *Id.* at 370. After reviewing dictionaries (including Collins English Dictionary and Merriam-Webster's Dictionary) and Texas statutes, the court concluded that the word "abuse" "must be interpreted to require a level of culpability greater than negligence." *Id.* at 376. The court thus held that the abuse exclusion did not necessarily apply to a daycare worker who allegedly "violently grabbed [a toddler's] leg and dragged him across the floor, causing severe physical injuries." *Id.* at 360 (quotation omitted and alteration adopted).

In *Dorchester Mutual Insurance Co. v. Krusell*, 150 N.E.3d 731 (Mass. 2020), the Massachusetts Supreme Court held that "the term 'abuse' is susceptible of more than one meaning and reasonably intelligent persons could differ as to which meaning is the proper one." *Id.* at 738. After consulting dictionaries, statutes, and case law from other jurisdictions, the court concluded that a reasonable insured could understand the term abuse to apply to "a misuse of power or, perhaps, conduct so extreme, as to indicate an abuser's disposition towards inflicting pain and suffering." *Id.* at 744. The court thus interpreted the term not to exclude coverage for a 23-year-

26

old who pushed a 62-year-old, "causing [the 62-year-old] to lose his balance and fall onto a parked automobile before striking the pavement … , which ultimately resulted in permanent damage to his right arm." *Id.* at 735.

In *Cincinnati Insurance Co. v. Hall*, No. 308002, 2013 WL 3107640 (Mich. Ct. App. June 20, 2013), a Michigan court held that the "common meaning" of the word "abuse" "necessarily connotes intentional, purposeful conduct." *Id.* at *6. The court thus declined to apply an abuse exclusion where the employee of care center for developmentally disabled adults allegedly failed to intervene when one adult struck another and blinded him. *Id.* at *2. The court reached that conclusion even though the employee "pleaded no contest to criminal charges." *Id.*

A number of courts have reached the same conclusion in cases involving alleged sexual abuse. *See U.S. Fire Ins. Co. v. Mother Earth Sch.*, 423 F. Supp. 3d 1048, 1053 (D. Ore. 2019) ("[T]he Court agrees with Defendants … that, at a minimum, the plain and ordinary meanings of 'abuse' and 'molestation' necessarily require intentional conduct."); *Univ. N. Am. Ins. Co. v. Colosi*, 322 F. Supp. 3d 1071, 1074 (D. Nev. 2018) ("And 'physical abuse' is generally understood to be an intentional act that causes physical injury to the victim.").

There are courts that have reached the opposite conclusion. *See, e.g.*, *Nautilus Ins. Co. v. Our Camp Inc.*, 136 F. App'x 134, 138 (10th Cir. 2005) (unpublished) ("The exclusion at issue unambiguously excludes coverage for all types of negligent

27

conduct arising out of the abuse or molestation by anyone of any person.""). But division among courts in other jurisdictions "weighs heavily" in favor of ambiguity. *St. Paul Mercury Ins.*, 774 F.3d at 710.

*    *    *

All that to say, dictionary definitions, Georgia statutes, the Policy itself, and cases from other jurisdictions establish that "abuse" can logically and reasonably be construed to mean conduct intended to cause harm. That construction controls under the bedrock rule that courts construe exclusions against the insurer—even if Markel offers a logical or reasonable construction of its own. Markel could have broadly defined "abuse" in the Abuse Exclusion if it wanted. *See St. Paul Mercury Ins.*, 774 F.3d at 709. But Markel cannot adopt an after-the-fact construction in litigation that subjects Ms. Humphrey to millions in liability when it failed in its duty to define the Abuse Exclusion in "clear and explicit terms." *York Ins. Co.*, 223 F.3d at 1255.

At bottom, the district court ruled against coverage because it thought it was "manifestly apparent" that Ms. Humphrey should not "reasonably expect" coverage, notwithstanding the binding judgment and undisputed evidence that Ms. Humphrey did not intend to hurt K.J.K. Doc. 113 at 18, 20. Indeed, the district court itself stated at a hearing that it did not believe Ms. Humphrey acted intentionally. Doc. 110 at 40. Georgia courts do not determine coverage based on whether they judge the insured as having done something wrong. Coverage and the insured's expectations

28

are based on the policy terms, construed "in favor of the insured." *Blue Ridge Auto Auction v. Acceptance Indemnity Ins. Co.*, 807 S.E.2d 51, 53 (Ga. Ct. App. 2017). This Court should reverse the district court's construction of the Abuse Exclusion in favor of Markel and hold that the exclusion does not apply to Ms. Humphrey's unintentional conduct.

## II.    The district court erred in ruling that Humphrey's Georgia first-offender plea was an "adjudication of wrongdoing" that relieved Markel of its duty to defend.

Markel's breach of its duty to defend is an independent basis for reversal, even if the Court concludes Markel did not breach its duty to indemnify. "[A]n insurer's duty to defend is a separate and independent obligation that is broader than the duty to indemnify." *Colliers Int'l - Atlanta, LLC v. Maxum Indem. Co.*, 640 F. Supp. 3d 1343, 1357 (N.D. Ga. 2022). "If the facts as alleged in the complaint even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend the action." *Id.*

The Policy obligated Markel to defend Ms. Humphrey until she was "adjudicated to be a wrongdoer." Doc. 83-4 at 166. The district court misconstrued Ms. Humphrey's first-offender plea as an adjudication that excused Markel from defending. That was wrong. A first-offender plea is not an "adjudication" under Georgia law. Ms. Humphrey had not been "adjudicated" to be anything at the time of the May 2023 civil trial, and Markel should have given her a defense. Had Markel

29

done so, the trial might well have ended with a smaller judgment. Revieing *de novo*, this Court should reverse summary judgment to Markel on this ground as well. *See AEGIS Elec.*, 967 F.3d at 1223.

### A. A Georgia first-offender plea is not an adjudication of wrongdoing.

The plain text of the Georgia First Offender Act forecloses the district court's ruling that a first-offender plea is an adjudication of wrongdoing. A first-offender plea allows Georgia courts, "*before* an adjudication of guilt" and "*without entering a judgment of guilt,*" to "defer further proceedings" and sentence a criminal defendant without prior convictions to probation or confinement. O.C.G.A. § 42-8-60(a) (emphases added). During the sentence, the defendant "shall *not* be deemed to have been convicted." O.C.G.A. § 42-8-65(c)(1) (emphasis added). And when the defendant "successfully complies with [the] sentencing order," the defendant is "exonerated of guilt and shall stand discharged as a matter of law." O.C.G.A. § 42-8-60(a). While the defendant serves the first-offender sentence, "the case has, in effect, been suspended." *Davis v. State*, 537 S.E.2d 663, 665 (Ga. 2000). There is, in short, no criminal judgment against Ms. Humphrey.

The district court's reading of the Abuse Exclusion fails to give the word "adjudication" its technical legal meaning. Doc. 113 at 34. When a contract uses "technical words, words of art, or words used in a particular trade or business," courts must "construe[]" those words "to be used in reference to this peculiar

30

meaning." O.C.G.A. § 13-2-2(2). An adjudication refers to something specific in law: "[t]he legal process of resolving a dispute; the process of judicially deciding a case," or entering a "judgment," meaning "[a] court or other tribunal's final determination of the rights and obligations of the parties." Adjudication, Black's Law Dictionary (12th ed. 2024); Judgment, Black's Law Dictionary (12th ed. 2024). At the time of the May 2023 bench trial, there was undisputedly no judgment against Ms. Humphrey, so Markel should have defended.

The district court believed that the use of Georgia first-offender pleas in other contexts—the U.S. Sentencing Guidelines, the Immigration and Nationality Act, and the Sex Offender Registration and Notification Act—supported its conclusion. Doc. 113 at 35. But the district court failed to see that in each case the relevant statutory or regulatory scheme specifically defined withheld adjudications as convictions.

The Sentencing Guidelines commentary directs that convictions obtained under "procedures pursuant to which previous convictions may be set aside … for reasons unrelated to innocence or errors of law" should count toward a defendant's criminal history. U.S.S.G. § 4A1.2, comment n.10. The Immigration and Nationality Act defines a conviction to include cases where "adjudication of guilt has been withheld." 8 U.S.C. § 1101(a)(48)(A). And the Sex Offender Registration and Notification Act implementing regulations similarly explain that the registration requirement for sex offenders applies even if under state procedures a conviction

31

"may nominally be 'vacated' or 'set aside,' but the sex offender is nevertheless required to serve what amounts to a criminal sentence for the offense." *Nat'l Guidelines for Sex Offender Registration and Notification*, 73 Fed. Reg. 38,030, 38,050 (July 2, 2008).

Unlike these statutes and regulations, the Policy does not define adjudication. The need for these other statutes and regulations to expressly include withheld adjudications indicates that terms like "conviction" and "adjudication" do *not* ordinarily include withheld adjudications like a first-offender plea—or at least, that these terms do not unambiguously include first-offender pleas. And the Court well knows that ambiguities go against Markel as the drafter.

The district court also erroneously interpreted the Policy relying on inapplicable Georgia precedent holding that nolo contendere pleas cannot be used for impeachment. *See* Doc. 113 at 36 (citing *Pitmon v. State*, 595 S.E.2d 360, 364 (Ga. Ct. App. 2004)). *Pitmon* found support for that conclusion in precedent holding that first-offender pleas also cannot be used for impeachment. 595 S.E.2d at 363–64 (citing *Matthews v. State*, 493 S.E.2d 136 (Ga. 1997)). But nolo contendere pleas and first-offender pleas are inadmissible as impeachment evidence for very different reasons. The Georgia legislature made nolo contendere pleas inadmissible by statute: "a plea of nolo contendere shall not be used against the defendant in any other court or proceedings as an admission of guilt or otherwise or for any purpose." O.C.G.A.

32

§ 17-7-95(c). First-offender pleas, by contrast, are inadmissible because "there is no adjudication of guilt." *Matthews*, 493 S.E.2d at 140.

### B. A jury could conclude the judgment would have been smaller if Markel had defended Ms. Humphrey.

Markel's breach of its duty to defend had grave consequences for Ms. Humphrey. Ms. Humphrey presented no evidence at trial and asked no questions of any witnesses because she "had no idea what to do" without a lawyer. Doc. 83-29 at 14. That happened while Markel paid an attorney representing Ms. Humphrey's former employer to look on. "[W]here an insurance company fails to offer a defense, it may be liable to its insured beyond the policy limits to the full amount of the judgment" if its "breach … caused the insured to be exposed to greatly increased liability." *Khan v. Landmark Am. Ins. Co.*, 757 S.E.2d 151, 156 (Ga. Ct. App. 2014).

A jury could find the trial would have ended differently for Ms. Humphrey if she had a defense. To start, a competent lawyer could have excluded undisclosed expert testimony presented at the civil trial, which supported $2 million in special damages of the $9.2 million judgment. Doc. 1-1 at 3. Georgia civil procedure requires pretrial disclosure of experts, and Georgia courts may exclude undisclosed expert testimony. *See Lee v. Smith*, 878 S.E.2d 594, 600 (Ga. Ct. App. 2022). The counsel Markel paid to defend Childcare Network even testified she would have objected to that testimony. Doc. 86-2 at 16. Additionally, the Kibbys presented a video of the expert testimony, and a defense lawyer could have insisted that the

expert be present for cross-examination. That alone shows that Markel's failure to defend exposed Ms. Humphrey to greater liability.

And there is more. The Kibbys requested $9.2 million in damages and even prepared a proposed judgment with that amount pre-filled in. Doc. 1-1 at 3. The state court signed that judgment the day of the trial. Doc. 1-1 at 3. Ms. Humphrey did not challenge the Kibbys' evidence or advocate for lower damages, as competent defense counsel would have done. Doc. 83-29 at 14. Any defense would have been better than Ms. Humphrey's inability to defend herself. A jury could find that a defense by Markel would have resulted in a lower judgment on this basis as well.

The Court should therefore reverse the grant of summary judgment to Markel on its breach of its duty to defend.

### III.    The district court erred in granting summary judgment to Markel on Ms. Humphrey's claim for bad faith.

The district court granted summary judgment to Markel on Ms. Humphrey's bad faith claim[12] under O.C.G.A. § 33-4-6 because it concluded Markel had no duty to defend or indemnify. Doc. 113 at 37. That conclusion was error. The Court should review *de novo* and reverse summary judgment on the bad faith claim. *See AEGIS Elec.*, 967 F.3d at 1223. The district court was also wrong on the facts supporting

---

[12] The Kibbys did not assert a bad faith claim because "Georgia courts do not allow an insured to assign a statutory claim" for bad faith. *Camacho v. Nationwide Mut. Ins. Co.*, 188 F. Supp. 3d 1331, 1355 (N.D. Ga. 2016) (emphasis omitted).

34

the claim. Ms. Humphrey presented evidence from which a reasonable jury could conclude that Markel acted in bad faith.

Statutory bad faith in Georgia under O.C.G.A. § 33-4-6 "is any frivolous and unfounded refusal in law or in fact to pay according to the terms of the policy." *Lowery v. AmGuard Ins. Co.*, 629 F. Supp. 3d 1296, 1309 (N.D. Ga. 2022) (quotation omitted). Bad faith penalties are not allowed if the insurer "has any reasonable ground to contest the claim and where there is a disputed question of fact." *Id.* But courts must "carefully scrutinize any claim of a contest in facts to preclude the reliance by an insurance company on fanciful allegations of factual conflict to delay or avoid legitimate claims payment." *Id.* And the Court must judge bad faith "as of the time of trial … and not at the time of refusal to pay upon demand." *State Farm Mut. Ins. Co. v. Drury*, 474 S.E.2d 64, 69 (Ga. Ct. App. 1996).

By that standard, a jury must decide Markel's bad faith. There is no conflict about the underlying incident; everyone agrees what happened. Ms. Humphrey requested a defense in December 2022 in advance of a January 2023 hearing and long before the May 2023 trial. Doc. 83-29 at 3–4; *see also* Doc. 8-1. Markel never sent Ms. Humphrey a letter denying coverage or even spoke to her. Doc. 81-4 at 5–6. Markel internally decided not to defend with its claims file, stating merely that "she was served in jail with the lawsuit." Doc. 83-27 at 56. In this litigation, Markel

argues its denial was proper because she "abused" K.J.K. with the sole basis for support being her first-offender plea. Doc. 81-4 at 4, 6.

But there is no evidence that Markel made any effort to determine the meaning of the Abuse Exclusion or whether Ms. Humphrey's conduct fit into it. Doc. 86-1 at 13. Nor did Markel try to determine Ms. Humphrey's intent or the elements of the crime to which Ms. Humphrey pled, or review the video of the incident. Doc. 81-4 at 6. Doc. 81-4 at 10. Markel denied Ms. Humphrey's request for indemnification of the judgment based solely on the first-offender plea and its contention that she "abused" K.J.K., and again without any investigation. Doc. 86-1 at 13.

A jury could find bad faith on at least three grounds. First, Markel made no effort to address any ambiguities in the Policy. The Georgia Court of Appeals has held that "it cannot be said *as a matter of law*" that an insurer has a reasonable defense or cause to deny a claim if it is "on notice as to the ambiguities in the policy's coverage." *Auto-Owners Ins. Co. v. Neisler*, 779 S.E.2d 55, 62 (Ga. Ct. App. 2015) (emphasis added); *see also id.* at 62 n.26 (collecting authority). This holding flows from the rule that "ambiguous insurance-contract language be construed in favor of the insured." *Id.* at 62. Markel itself defined "abuse" differently in the Texas Professional Liability Rider than it now contends the courts should define the term. A jury could find that Markel's own flip-flopping about the scope of the word "abuse" gave it knowledge of ambiguities in the Policy's coverage. The district court

36

failed to recognize this ground for bad faith because it wrongly concluded that the Policy is unambiguous. Doc. 113 at 39.

Second, Markel's failure to investigate gives the jury another basis to find bad faith. Juries may award bad faith penalties based on "evidence … that no thorough investigation had been made prior to the denial of the claim." *USAA v. Carroll*, 486 S.E.2d 613, 616 (Ga. Ct. App. 1997). When it declined to defend, Markel conducted no investigation outside of determining that Ms. Humphrey was in jail. And it refused to indemnify the judgment based solely on the first-offender plea to second-degree cruelty to children. To Markel, "it's cruelty if you're looking at it and it's – you just know it." Doc. 86-1 at 16. Yet, there is no evidence that Markel "look[ed] at it" by watching video of the incident. Doc. 81-4 at 6. In other words, Markel appears to have allowed "mistaken preconceptions" about Ms. Humphrey's plea to "taint [its] investigation." *Cincinnati Ins. Co. v. Kastner*, 504 S.E.2d 496, 497 (Ga. Ct. App. 1998). In fact, the record does not support that Markel did any investigation whatsoever. That supports a finding of bad faith under Georgia law. *See id.*

Third, Markel's failure to defend Ms. Humphrey is yet another basis to find bad faith. "If an insurance company chooses NOT to provide a defense, it assumes the risk that it is not absolutely right that the claim does not fall under the policy, and it exposes itself to a bad faith claim." *Transp. Ins. Co. v. Piedmont Constr. Grp., LLC*, 686 S.E.2d 824, 828 (Ga. Ct. App. 2009) (quotation omitted and alteration

adopted). Indeed, in *Transportation Insurance Co.*, the Court of Appeals held the insurer acted in bad faith as a matter of law when it erroneously relied on an inapplicable exclusion without undertaking any analysis of whether the exclusion even applied—as Markel did here. *See id.* at 828–29.

For its part, Markel cited *Colonial Oil Indus., Inc. v. Underwriters Subscribing to Policy Nos. TO31504670*, 491 S.E.2d 337 (Ga. 1997), for the proposition that it could rely on the allegations of the complaint with no investigation of its own. *See id.* at 338. That overstates the rule. "Georgia law does not permit an insurer to rely on the allegations of the complaint to deny coverage when the facts that the insurer *knows or can ascertain* show that the claim is within the coverage of the policy." *Schneider Nat'l Carriers, Inc. v. Utd. Spec'y Ins. Co.*, 603 F. Supp. 3d 1352, 1358 (M.D. Ga. 2022) (quotation omitted and emphasis added). Markel could easily have ascertained that Ms. Humphrey took a first-offender plea to an offense that does not require intent, which would take her outside the Abuse Exclusion. Markel cannot shirk its duty to investigate and expect to avoid bad faith.

Because the Policy affords coverage, the Court should therefore reverse the judgment for Markel on bad faith and remand for a trial on that claim.

## CONCLUSION

For these reasons, the Court should reverse the grant of summary judgment to Markel. The Court should remand for entry of judgment in favor of the Kibbys and

38

Ms. Humphrey on Markel's breach of its duty to indemnify. Alternatively, even if the Court holds Markel had no duty to indemnify, the Court should remand for entry of judgment in favor of the Kibbys and Ms. Humphrey on Markel's breach of its duty to defend and a trial on the damages caused by that breach. And in either case, the Court should remand for a trial on Markel's bad faith.

Respectfully submitted this 12th day of February, 2025.

/s/ Frank M. Lowrey IV
Frank M. Lowrey IV
Georgia Bar No. 410310
lowrey@bmelaw.com
Matthew R. Sellers
Georgia Bar No. 691202
sellers@bmelaw.com
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

*Attorneys for Appellants*

Dustin T. Brown
Ga. Bar No. 086998
dustin@crawfordandbrown.com
Crawford & Brown Law Firm LLP
P.O. Box 1118
1430 Wynnton Road (31906)
Columbus, GA 31902
Tel.: 706-320-9646
Fax: 706-494-0221

*Attorney for Courtney Bowen, Justin Kibby, and K.J.K.*

39

Jefferson C. Callier
Ga. Bar No. 105250
calcallier@aol.com
the.callier.firm@gmail.com
The Callier Firm
P.O. Box 2604
1430 Wynnton Road (31906)
Columbus, GA 31902
Tel.: 706-323-7711
Fax: 706-323-7544

Michael D. Flint
Ga. Bar No. 264725
Mary Ellen A. Lighthiser
Ga. Bar No. 105407
mel@mcclurelegal.com
McClure & Kornheiser, LLC
6400 Powers Ferry Rd., Ste. 150
Atlanta, GA 30339
Tel.: 678-338-2680
Fax: 378-338-2690

*Attorneys for Samantha Humphrey*

40

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains a total of 8,896 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(i) and 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on February 12, 2025.

/s/ Matthew R. Sellers
Matthew R. Sellers
Ga. Bar. No. 691202

## CERTIFICATE OF SERVICE

I certify that on February 12, 2025, I served a copy of this **APPELLANTS'**

**OPENING BRIEF** by filing it with the Court's CM/ECF system, which will

automatically serve a copy on all attorneys of record.

*/s/ Matthew R. Sellers*
Matthew R. Sellers
Ga. Bar. No. 691202